# EXHIBIT "A"

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL ANDRIOLA, C.P.A. | **Civil Action No. 3:25-cv-01908-GC-JBD** |
| Plaintiff, | **NOTICE OF MOTION FOR SUMMARY JUDGMENT TO COMPEL ARBITRATION AND DISMISS COMPLAINT** |
| v. | |
| PKFOD HOLDINGS, LLC, PKF O'CONNOR DAVIES, LLP, and PKF O'CONNOR DAVIES ADVISORY, LLC, | |
| Defendants. | |

**To:**
Eric H. Jaso, Esq.
363 Bloomfield Avenue
Suite 2C
Montclair, New Jersey 07042
Tel: (973) 232-0881
E: ejaso@shnlegal.com
*Attorneys for Plaintiff*
*Michael Andriola, C.P.A.*

**PLEASE TAKE NOTICE** that on November 10, 2025 at 10:00 A.M., or as soon thereafter as counsel may be heard, the undersigned attorneys for Defendants ("Defendants" or "PKFOD"), shall move before the Honorable Georgette Castner, U.S.D.J., at the United States District Court for the District of New Jersey, Clarkson S. Fisher Building & U.S. Courthouse, 402 East State Street, Trenton, NJ 08608, for an Order under <u>Fed. R. Civ. Pro.</u> 56 compelling Plaintiff's Complaint against Defendants to arbitration, and dismissing the complaint.

**PLEASE TAKE FURTHER NOTICE,** that Defendants shall rely upon the <u>Local R. Civ. Pro.</u> 56.1 Statement of Undisputed Material Facts, Brief in Support of Motion to Compel Arbitration, Certification of Counsel with Exhibits, Certification of Thomas R. Manisero, Esq.,

1

with Exhibits, Certification of Jeffrey Gittler, CPA with Exhibits, Certification of Peter Floersch,

CPA and proposed form of Order submitted herewith.

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
*Attorneys for Defendants*

By:  /s/    *Thomas F. Quinn*
Thomas F. Quinn, Esq.
7 Giralda Farms
Madison, NJ 07940
Tel: (973) 624-0800
Fax: (973) 624-0808
thomas.quinn@wilsonelser.com

Dated: September 22, 2025

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MICHAEL ANDRIOLA, C.P.A. | **Civil Action No. 3:25-cv-01908-GC-JBD** |
| Plaintiff, | |
| v. | |
| PKFOD HOLDINGS, LLC, PKF O'CONNOR DAVIES, LLP, and PKF O'CONNOR DAVIES ADVISORY, LLC, | **DEFENDANTS' L. Civ. R. 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT** |
| Defendants. | |

Pursuant to <u>L. Civ. R. 56.1</u>, Defendants, PKFOD Holdings LLC, PKF O'Connor Davies, LLP, and PKF O'Connor Davis Advisory, LLC, ("PKFOD" or "Defendants"), submit this statement of material facts in support of their Motion to Compel Arbitration and Dismiss the Complaint. Defendants accept the below facts as true for the purposes of this Motion **only**.

1

**Plaintiff Became a PKFOD Partner in 2018 and Agreed to Arbitrate Disputes with PKFOD**

1.      On July 9, 2018, Plaintiff became a partner at PKF O'Connor Davies LLP ("PKFOD LLP"), a large national accounting firm. He signed four agreements with PKFOD LLP, effective July 9, 2018, as part of becoming a partner with this Defendant: (i) Income Partner Agreement; (ii) Non-Solicitation Agreement; (iii) Confidentiality Agreement and (iv) Income Partner Earnings Agreement. (Manisero Cert., Exhs. 1-4).

2.      In the Income Partner Agreement (Exh. 1), Andriola and PKFOD LLP agreed as follows:

> ARTICLE III: Duties of Income Partner
>
> 1.    Income Partner shall devote his full time and attention to the business of the Partnership and shall give, whenever required, a true account of all business transactions arising out of or connected with the conduct of the business of the Partnership.
>
> 4.    It shall be the duty of Income Partner to adhere to the standards of professional practice embodied in both the general standards of the profession as well as those promulgated by the Partnership from time to time, in writing and which have been provided to him.

3.      Further, in the same agreement, Andriola and PKFOD LLP agreed as follows to mediate and arbitrate any disputes:

> Any and all disputes, controversies and claims arising out of or relating to this Agreement, or concerning the respective rights or obligations hereunder of the parties hereto, as well as the rights and obligations of the parties under the Non-solicitation Agreement or

2

the Income Partner Earnings Agreement, all entered into as of the 9th day of July, 2018, shall be settled and determined by arbitration in White Plains, New York, before the American Arbitration Association in accordance with and pursuant to its then applicable Rules for Commercial Arbitration. Any arbitration shall be conducted and determined by a panel of three (3) arbitrators who shall be required to issue a reasoned decision and award resolving the dispute. The arbitrators shall have the power to award specific performance or injunctive relief and reasonable attorneys' fees and expenses to the Prevailing Party (which shall mean the party determined by the arbitrators to have most nearly prevailed, even if such party did not prevail in all matters, or is not the party in whose favor an award is rendered) in such arbitration.

The arbitration award shall be final and binding upon the parties, and Judgment may be entered on the award in any court of competent Jurisdiction.

As promptly as possible after the commencement of the arbitration, but in no event later than thirty (30) days thereafter, the parties shall mediate their dispute(s) under the auspices of the American Arbitration Association. Prior to the mediation, the parties shall execute any required mediation submission agreements.

## **Plaintiff's Complaint and Dispute with Defendants**

4.      PKFOD provided professional services to certain corporations owned and/or controlled by Nelson Ferreira. (Complaint, ¶2).  Plaintiff served as the relationship partner and was the most senior accountant providing services to these corporations.  Id.

5.      Nelson Ferreira's primary and largest business was Ferreira Construction Co., Inc. ("FCC"), of which Nelson was the President and Chief Executive Officer.  Id.  Ferreira also owned additional corporate entities, including Ferreira Construction Trucking, Inc., Ferreira Power Group, LLC, Ferreira Power West, LLC, NatNel LLC, Vanguard Energy Partners, Valiant Energy Services,

3

Valiant Power South, LLC, and Valiant Power Group/S.M. Electrica (these entities collectively will be referred to as the "Ferreira Entities"). (Complaint, ¶5).

6.     In early 2021, Plaintiff was the PKFOD LLP engagement partner for a financial statement audit of Valiant Energy Services ("VES"), one of the Ferriera Entities. (Complaint, ¶6)

7.     In the course of the audit, Plaintiff alleges that he discovered VES had obtained a government-guaranteed Paycheck Protection Program ("PPP") loan in 2020. (Complaint, ¶7).

8.     Plaintiff was knowledgeable about PPP loans and had advised several PKFOD clients (though none of the Ferreira Entities) as to their eligibility and accounting treatment. According to his Compliant, Plaintiff alleges he knew that the corporate group comprising VES and the other Ferreira Entities (as well as other corporate entities owned in whole or in part by Ferreira) were too large in headcount and financial size to qualify for such loans. (Complaint, ¶8).

9.     According to Plaintiff's Complaint, Plaintiff brought this to the attention of Ferreira management, including Nelson Ferreira himself. Plaintiff then learned that other Ferreira Entities had also obtained PPP loans, and that Ferriera's management was satisfied that if the companies had been ineligible, the lender would not have extended the loans. (Complaint, ¶9).

4

10.     Andriola's conversation with Ferriera management that it was not eligible for the PPP loans was not documented in the PKFOD LLP audit work papers. (Gittler Cert., ¶5).  Plaintiff as the engagement partner was in charge of making sure the PKFOD work papers were complete and accurate. Id.  Nevertheless, there is no document in the 2020 VES audit work papers evidencing communication between Plaintiff and Ferriera management that they were ineligible for the PPP loan. (Id.)

11.     Attached to the Gittler Certification as Exhibit C is the PKFOD LLP Report for Processing Checklist ("RPC") for the 2020 VES audit and workpaper file. It shows that Kevin Tennyson, CPA, a Manager, was the in-charge accountant who drafted and reviewed the report, and signed off on February 24, 2021.  "MA," who is the Plaintiff, in his role as engagement partner, approved the draft report on February 24, 2021. Id.  The RPC further shows that Jeffrey Gittler, CPA, a PKFOD LLP partner in 2021, was the "Pre-Issue Reviewer" for quality control purposes and he signed off and approved the draft report on March 2, 2021.  (Gittler Cert., ¶4).

12.     According to his Complaint, Plaintiff informed Jeffrey Gittler that VES was ineligible to get a PPP loan.  Specifically, Plaintiff alleges that he spoke "with a fellow partner at PKFOD who was the assigned independent reviewer for the financial statement." (Complaint, ¶9).

5

13.     Jeffrey Gittler denies such a conversation ever occurred and adds that, if it had, he and Plaintiff would both have had to escalate the issue to a formal consultation with firm management, which would have resulted in PKFOD refusing to issue an audit opinion that the financial statements were fairly presented in the form, and with the disclosures included, in the 2020 VES Audited Financial Statements as they were.  (Gittler Cert., ¶¶5-6).

14.     As noted in Jeffrey Gittler's Certification, and as shown on the VES 2020 Audited Financial Statements, PKFOD's Independent Auditor's Report that Plaintiff was in charge of issuing states that, in PKFOD's opinion, "the financial statements referred to above present fairly, in all material respects, the financial position" of VES as of, and for the year ending December 31, 2020."  (Id. at ¶6).

15.     The 2020 VES Audited Financial Statements included a Note 11 indicating that the PPP loan might not be forgiven.  (Complaint, ¶9).

16.     However, Note 11 does not indicate that VES was not eligible to write-off the loan early or in any way suggest that VES was never eligible to receive the PPP loan.  (Gittler Cert., ¶6).  Instead, Note 11 merely indicates that VES obtained the PPP loan, had applied for forgiveness of the loan, and the bank had approved the application and forwarded it to the SBA, so VES was recognizing the forgiveness early. The Note states:

**Commitments and Contingencies**

The Company's operations and financial performance have been affected by the recent and ongoing outbreak of the coronavirus disease (COVID-19), which was declared a pandemic by the World Health Organization in March 2020. Many countries around the world, including the United States, have significant governmental measures being implemented to control the spread of COVID-19, including temporary closures of businesses, severe restrictions on travel and the movement of people and other material limitations on the conduct of business.

The Company has taken several steps to strengthen its financial position and balance sheet and to maintain financial liquidity and flexibility. The Company applied for and has received a $4,551,600 Paycheck Protection Program loan (the "PPP Loan") from the Small Business Administration ("SBA"). Subsequent to year-end, the Company submitted its forgiveness application to the bank, who in turn approved it and sent it to the SBA for final approval. The Company believes that it has met all of the conditions for forgiveness of the PPP loan at December 31, 2020. In anticipation of the PPP loan being forgiven the Company has elected to follow the guidance in International Accounting Standards ("IAS") 20, *Accounting for Government Grants and Disclosure of Government Assistance.* IAS 20 allows a forgivable loan from government to be treated as a reduction to salary expenses. For the year ended December 31, 2020, all the PPP loan proceeds have been recognized as a reduction to salary expense, which comprised the underlying eligible costs submitted for forgiveness. The SBA has been releasing PPP loan program interpretations on a frequent basis (daily at times) and while management believes all loan forgiveness conditions have been met, there is no guarantee that the SBA will ultimately forgive a portion or the entire amount of the loan. Consequently, management's estimate of forgiveness could change and such amount could be material.

(Gittler Cert., Exh. B).

### Plaintiff's First *Qui Tam* Lawsuit Against Ferriera

17.     On June 2, 2023, Plaintiff authorized Worldwide Incorporators Ltd to file a Certificate of Formation in Delaware to form a wholly-owned limited liability company, CLIP LLC.  (Quinn Cert., Exh. 1).

18.     On July 18, 2023, CLIP LLC filed a *qui tam* lawsuit against Ferreira Entities VES, America Pile and Foundation ("APF"), and Valiant Power Group ("VPG"), all of which received PPP loans, as well as FCC and Ferreira personally (collectively, the "Ferreira Defendants"), alleging that they had violated the False Claims Act in applying for the PPP loans and obtaining forgiveness of those loans. (Quinn Cert., Exh. 2).

19.     After investigating, the Government declined to intervene in the lawsuit, and Plaintiff has proceeded to litigate the unsealed case against the Ferreira Defendants.  (Complaint, ¶11)

20.     On December 17, 2024, counsel for the Ferreira Defendants emailed a letter to PKFOD's General Counsel, Thomas Manisero, Esq., to request that PKFOD search its files for potentially privileged communications of the Ferriera Defendants that Plaintiff as a PKFOD partner may have had on PKFOD's computer systems. (Manisero Cert., ¶3 & Exh. 5).  It was the first time that Defendants' General Counsel or PKFOD management learned of Plaintiff filing this FCA lawsuit.  Id. at ¶4.

21. After receiving this news, PKFOD management communicated with Plaintiff and Plaintiff's counsel that Plaintiff's actions were inconsistent with his contractual and ethical duties as a PKFOD partner. Id. at ¶5.

22. On January 31, 2025, PKFOD suspended Plaintiff as per the letter of its General Counsel. (Manisero Cert., ¶6 & Exh. 6).

23. On March 17, 2025, Plaintiff filed his current lawsuit against Defendants for FCA whistleblower retaliation. (Complaint).

24. By letter, dated August 12, 2025, PKFOD through its General Counsel notified Plaintiff that he was terminated. (Manisero Cert., ¶7 & Exh.7).

**Plaintiff's Second Qui Tam Lawsuit - RTTNA**

25. In June 2020, RTTNA's management asked its relationship partner Peter Floersch, CPA about obtaining loans from the government under the Payment Protection Program ("PPP"). Mr. Floresch cautioned them about making sure the companies qualified for the loans because the PPP regulations that were still evolving disqualified larger companies over 500 employees from participating and he was not certain how those rules applied to consolidated and affiliate companies. At the time, Plaintiff was considered an internal specialist on PPP matters and Mr. Floresch asked him to participate in phone calls with RTTNA management concerning the companies' eligibility for the PPP program. Plaintiff spoke both with Mr. Floresch and RTTNA management concerning PPP loans.

9

26.     On September 11, 2023, Plaintiff authorized Worldwide Incorporators Ltd to file a Certificate of Formation in Delaware to form a wholly-owned limited liability company, SCISSORS LLC.  (Quinn Cert., Exh. 3)

27.     On September 29, 2023, SCISSORS LLC filed a *qui tam* lawsuit against three RTTNA companies apparently based at least in part on the information Plaintiff obtained when he provided consultation services to RTTNA in 2020. (Quinn Cert., Exh. 4).

28.     After investigating, the Government intervened in the RTTNA lawsuit as part of settling the case.  (Quinn Cert., Exh. 5).  The Complaint was then dismissed with prejudice by order of June 25, 2025. (Quinn Cert., Exh. 6).

29.     On June 25, 2025, the Department of Justice announced the $13 million settlement of this matter.  (Quinn Cert., Exh. 7).

30.     Under the terms of the settlement agreement also publicly disclosed on June 25, 2025, Plaintiff was awarded a Relator fee of $2.34 million and attorney fees of a little over $54,000.  (Quinn Cert., Exh. 8).

31.     The first time that the management of PKFOD learned of the Plaintiff's second *qui tam* lawsuit was weeks after RTTNA informed Mr. Floresch on August 15, 2025, that it was moving all of its audit and accounting work to another accounting firm.  (Floresch Cert., ¶5)

**2024 Agreements**

32.    On November 10, 2024, Plaintiff entered into a Partner Services Agreement ("2024 PSA") with PKFOD Holdings, LLC ("Holdings LLC").   The 2024 PSA governed the terms and conditions for Plaintiff to provide services as a "Partner" to and on behalf of Holdings LLC, including all direct and indirect subsidiaries.[1]  (Manisero Cert., Exh. 8**).**

33.    The 2024 PSA states in pertinent part in Section 2(c):

> During the Term, without the prior written consent of the Board, the Partner shall devote his or her full working time and efforts to performance of the Partner's duties hereunder and the affairs of the Company Group and shall not engage in any other business, profession or occupation for compensation or otherwise that would conflict or interfere with the rendition of such services, either directly or indirectly, without the prior written consent of the Board; **provided, however,** that this Agreement shall not preclude the Partner from (i) engaging in civic or charitable activities, (ii) providing tax advice or services for the Partner in his or her individual capacity or his or her immediate family members or their respective trusts or (iii) owning and managing the Partner's and his or her immediate family members' passive investments, in each case, so long as such activities do not materially interfere or conflict with the Partner's duties hereunder or violate any policies or procedures of the Company Group.(Emphasis in Original).

34.    The 2024 PSA also included compensation, bonus terms, and a detailed Termination Section.  Id.  Paragraph 15 of the PSA is a "WAIVER OF JURY TRIAL" provision that was set forth in all capital letters.  Id.

35.    Section 14(b) of the 2024 PSA ("Arbitration Clause") states that:

---

[1] Defendant PKF O'Connor Davies Advisory, LLC ("Advisory LLC") is an indirect, wholly-owned subsidiary of Holdings LLC.

11

### 14.    Governing Law; Jurisdiction

(b)    Each of the parties irrevocably and unconditionally agrees that in the event any controversy or claim arising out of this Agreement cannot be settled between the parties to the satisfaction of the parties, such controversy or claim shall be settled by arbitration before a single arbitrator administered in accordance with the then current Employment Arbitration Rules of the American Arbitration Association (the "Arbitration Rules").  No legal measures shall be taken except to enforce such arbitration and the award of the arbitrator unless otherwise provided by the Arbitration Rules or determined by the arbitrator.
[Id.].

36.    On November 10, 2024, Plaintiff also entered into a distinct and separate agreement with PKFOD LLP in the form of the PKF O'Connor Davies, LLP Third Amended and Restated Limited Liability Partnership Agreement. (Manisero Cert., Exh. 9).

37.    In Section 12.15 of this agreement, Plaintiff agreed to arbitrate any controversy or claim relating to PKFOD LLP.  This provision applied to "any controversy or claim arising out of this Agreement."  Id.  The arbitration clause was similar to the language in Section 14(b) of the 2024 PSA.  Id.

38.    On August 19, 2025, the Honorable Georgette Castner, U.S.D.J. entered an order in the Andriola v. Ferriera Construction Co., *qui tam* FCA lawsuit, appointing former New Jersey Chief Justice James R, Zazzali as a special master to "investigate and decide the parties' outstanding privilege disputes."  The order also

12

terminated the pending lawsuit, subject to re-opening it upon completion of the

special master's recommendation to the Court.  (Quinn Cert., Exh. 9).

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
*Attorneys for Defendants, PKFOD Holdings
LLC, PKF O'Connor Davies, LLP, and PKF
O'Connor Davis Advisory, LLC*

By:  /s/      *Thomas F. Quinn*
Thomas F. Quinn, Esq.
7 Giralda Farms
Madison, NJ 07940
Tel: (973) 624-0800
Fax: (973) 624-0808
thomas.quinn@wilsonelser.com

Dated: September 22, 2025

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL ANDRIOLA, C.P.A. | : | **Civil Action No. 3:25-cv-01908-GC-JBD** |
| Plaintiff, | : | |
| v. | : | |
| PKFOD HOLDINGS, LLC, | : | |
| PKF O'CONNOR DAVIES, LLP, and | : | |
| PKF O'CONNOR DAVIES ADVISORY, LLC, | : | |
| Defendants. | : | |

---

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT TO COMPEL ARBITRATION AND DISMISS THE COMPLAINT

---

THOMAS F. QUINN, ESQ.
Of Counsel and On the Brief

319229333v.2

# **TABLE OF CONTENTS**

**Page**

I.   SUMMARY Of L. CIV. R. 56.1 STATEMENT OF FACTS ........................... 1

LEGAL ARGUMENT ............................................................................. 8

POINT I.   THIS MOTION TO COMPEL ARBITRAION MUST BE DECIDED UNDER THE RULE 56 STANDARD AND THERE IS NO DELEGATION PROVISION IN THE PARTIES' ARBITRATION AGREEMNENT; NEVERTHELESS, THE UNDISPUTED MATRIAL FACTS AND SIGNED AGREEMENTS ALLOW THIS COURT TO COMPEL ARBITRATION WITHOUT DISCOVERY .......................................................... 8

POINT II.   THE COURT MUST COMPEL PLAINTIFF TO ARBITRATE HIS COMPLAINT ............................................. 11

1.   The Federal Arbitration Act Applies to the PKFOD Arbitration Agreement ................................................. 11

2.   The PKFOD Arbitration Agreement is Valid and By Its Express Terms Encompasses Plaintiff's Complaint ................... 13

CONCLUSION ...................................................................................... 22

319229333v.2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

AT&T Mobility, LLC v. Concepcion,
  563 U.S. 333 (2011) ...........................................................................12

Battaglia v. McKendry,
  233 F.3d 720 (3d Cir. 2000) .................................................. 15, 16, 17

Buckeye Check Cashing, Inc. v. Cardegna,
  546 U.S. 440 (2006) ...........................................................................12

Dorset v. United Healthcare Servs., Inc.,
  2024 U.S. Dist. LEXIS 118906 (D.N.J. July 8, 2024)...........................9

Gilmer v. Interstate/Johnson Lane Corp.,
  500 U.S. 20 (1991) .............................................................................12

Green Tree Fin. Corp.-Ala. v. Randolph,
  531 U.S. 79 (2000) .............................................................................12

Hall St. Assoc., LLC v. Mattel, Inc.,
  552 U.S. 576 (2008) ...........................................................................12

Howsam v. Dean Witter Reynolds, Inc.,
  537 U.S. 79 (2002) .............................................................................13

In re Kinoshita & Co.,
  287 F.2d 951 (2d Cir. 1961) ...............................................................15

Khazin v. TD Ameritrade Holding Corp.,
  773 F.3d 488 (3rd Cir. 2014) .............................................................13

Mastrobuono v. Shearson Lehman Hutton, Inc.,
  514 U.S. 52 (1995) .............................................................................13

Mikes v. Strauss,
  889 F.Supp. 746 (S.D.N.Y. 1995) ................................................ 13, 20

Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,
  460 U.S. 1 (1983) ...............................................................................12

319229333v.2

Orcutt v. Kettering Radiologists, Inc.,
    199 F.Supp.2d 746 (S.D. Ohio 2002) ...................................................................20

PacifiCare Health Sys., Inc. v. Book,
    538 U.S. 401 (2003)..............................................................................................13

Pannepucci v. Honigman Miller Schwartz & Cohn,
    281 Fed. Appx. 482, 2008 U.S. App, LEXIS 13200 (6th Cir. 2008)....................19

Perry v. Thomas,
    482 U.S. 483 (1987) .............................................................................................12

Sanford v. Bracewell & Guiliani, LLP,
    618 F. App'x 114 (3d Cir. 2015) ............................................................................8

United States ex rel Paige v. BAE Sys Tech.,
    566 Fed. Appx. 500 (6th Cir. 2014) .....................................................................14

United States ex rel. Ascolese v. Shoemaker Constr. Co.,
    55 F.4th 188 (3d Cir. 2022)............................................................................ 17, 18

United States ex rel. Dorsa v. Miraca Life Scis., Inc.,
    33 F.4th 352 (6th Cir. 2022).................................................................................14

Young v. Experian Info. Sols., Inc.,
    119 F.4th 314 (3d Cir. 2024) ............................................................................9, 10

**Statutes**

9 U.S.C. § 2.................................................................................................................12

9 U.S.C. § 4.................................................................................................................13

31 U.S.C. § 3730(h)....................................................................................1, 11, 13, 14

**Rules**

Fed. R. Civ. Pro. 12(b)(6)............................................................................................8

Fed. R. Civ. Pro. 56.................................................................................7, 8, 9, 10, 11

Fed. R. Civ. Pro. 56(d) .............................................................................................11

319229333v.2

## I.    SUMMARY Of L. CIV. R. 56.1 STATEMENT OF FACTS

Plaintiff, Michael Andriola, C.P.A., ("Plaintiff") filed this lawsuit against Defendants, PKFOD Holdings LLC, PKF O'Connor Davies, LLP, and PKF O'Connor Davis Advisory, LLC, ("PKFOD" or "Defendants"), alleging that PKFOD unlawfully retaliated against Plaintiff as a PKFOD employee and partner in violation of the False Claims Act, 31 U.S.C. § 3730(h) (the "FCA"), the New Jersey Conscientious Employee Protection Act ("CEPA"), and applicable New Jersey law.

At all relevant times to this lawsuit, Plaintiff was a partner at PKFOD, a large national accounting firm that provides a variety of accounting services to its clients, including but not limited to tax, auditing, and consulting services.

Plaintiff made a lateral move to PKFOD and started as a partner on July 9, 2018.  Plaintiff had expertise in the construction industry and this industry was the focus of his practice at PKFOD.  On the day he started, he signed a Partner Services Agreement ("2018 PSA") with PKFOD that obligated him to (i) "devote his full time and attention to the business of the Partnership and shall give, whenever required, a true account of all business transactions arising out of or connected with the conduct of the business of the Partnership;" (ii) "adhere to the standards of professional practice embodied in both the general standards of the profession as well as those promulgated by the Partnership," and (iii) arbitrate before the American Arbitration Association ("AAA") "any …disputes arising out of or relating to this Agreement,

1

or concerning the respective rights or obligations hereunder of the parties hereto."

In March 2020, as the COVID pandemic struck the United States, Congress enacted the Paycheck Protection Program ("PPP").   As described by the Department of Justice:

> Congress created the PPP in March 2020 to provide emergency financial assistance to Americans suffering from the economic effects of the COVID-19 pandemic. Under the PPP, eligible businesses could receive forgivable loans guaranteed by the Small Business Administration (SBA). Regulations provide various eligibility requirements for the PPP, including limitations on the number of employees and revenue size limits. In their loan applications, borrowers were required to certify that they were eligible for the PPP and that the information they provided was accurate.
>
> [Quinn Cert., Exh. 7].

Plaintiff became an internal resource concerning PPP at PKFOD by reviewing the available guidance and literature concerning the PPP program.  In 2020 and 2021, Plaintiff became professionally involved with two PKFOD clients that had procured PPP loans. One of those clients was Valiant Energy Services ("VES") for which Plaintiff was the engagement partner on an audit of VES' 2020 financial statements. This company was owned and/or controlled by Nelson Ferreira, whom Plaintiff knew and did work for prior to starting at PKFOD.  Andriola was the PKFOD relationship partner for Ferreira Construction Co., Inc. ("FCC") and several additional corporate

2

entities.  In doing the audit, Plaintiff discovered that VES had obtained a PPP loan in 2020 for over $4.5 million.  Plaintiff's Complaint contends that at the time of the audit, he knew the corporate group comprising VES and the other Ferreira companies was too large in headcount and financial size to qualify for PPP loans. Plaintiff alleges that he brought this to the attention of Ferreira management, including Nelson Ferreira himself, and learned that other Ferreira Entities had also obtained PPP loans.  Plaintiff further alleges that he also brought this problem to the attention of the PKFOD quality review partner on the 2020 audit. (Complaint, ¶¶7-9).

PKFOD's 2020 VES audit workpapers for which Plaintiff was responsible tell a different set of facts.  If Plaintiff warned Ferriera management to have VES repay the PPP loan and not accept forgiveness of it, those communication had to be in the PKFOD audit workpapers but they are not. (Gitler Cert., ¶5).  If Plaintiff brought this matter to the attention of the PKFOD quality control partner for the VES 2020 audit, the engagement team would have been required to have a formal consultation with the firm's management, which would have been memorialized in the workpapers for the audit. (Gittler Cert. ¶¶3-5)

Most important, Plaintiff as the partner in charge of the 2020 VES audit authorized the issuance of a PKFOD Independent Auditor's report accompanying the financial statements on March 3, 2021, provided the opinion that the financial statements were fairly presented. (Id. at ¶3 & Exh. B)  Rather than insisting that the

PPP loan continue to be carried as a liability because it should be repaid to the government, Plaintiff issued an opinion that the financial statements—which showed an early and complete forgiveness of the PPP loan despite not having been formally forgiven by the Small Business Administration—were fairly presented. (Gittler Cert., Exh. B). If Plaintiff believed that the PPP loan was improperly obtained, it should not have been written down as forgiven.

Plaintiff then doubled down on his PKFOD contractual and ethical transgressions regarding VES.  On June 2, 2023, he hired a company to form a Delaware limited liability company named CLIP LLC of which he was the sole shareholder so he could go into the business of being a Relator in a *qui tam* FCA lawsuit.  (Quinn Cert., Exh 1).  On July 18, 2023, CLIP LLC filed a *qui tam* FCA lawsuit against VES and several other Ferreira companies.  (Quinn Cert., Exh. 2). Plaintiff did not tell PKFOD about this business venture or ask permission; he did not provide "a true account of all business transactions arising out of or connected with the conduct of the business of the Partnership" as per his Partner Services Agreement. (Manisero Cert., ¶4 & Exh.1).

This lawsuit was recently administratively terminated by this Honorable Court by order dated August 19, 2025, so as to allow the appointed Special Master, the former New Jersey Chief Justice James R. Zazzali, to undertake an investigation of certain factual issues.  (Quinn Cert., Exh. 9).  In particular, the Special Master will

investigate Plaintiff's apparent agreement in September 2023 to consult with the Ferriera companies about how to defend the lawsuit that he had filed, which may have involved disclosure of attorney-client communications.  (Id.).

PKFOD learned about this qui tam lawsuit filed by its partner when counsel for the Ferreira Defendants sent a December 17, 2024 letter to PKFOD's General Counsel to request that PKFOD do a search of its files for potentially privileged communications of the Ferriera Defendants that may be in PKFOD's possession. Receipt of this letter was the first time that Defendants' General Counsel or PKFOD management learned of Plaintiff filing this FCA lawsuit.  (Manisero Cert. ¶¶3-4 & Exh. 5).

After receiving this letter, PKFOD management communicated with Plaintiff and Plaintiff's counsel how Plaintiff's actions were inconsistent with his contractual and ethical duties as a PKFOD partner.  (Id. at ¶5).  On January 31, 2025, PKFOD suspended Plaintiff as per the letter of its General Counsel.  (Manisero Cert. ¶6 & Exh. 6).  By letter, dated August 12, 2025, PKFOD through its General Counsel notified Plaintiff that he was terminated. (Manisero Cert. ¶7 & Exh. 7)

During the entire time between December 17, 2024 and August 12, 2025, Plaintiff failed to reveal another critical fact about his professional activities.  In particular, Plaintiff was consulted by PKFOD client Rema Tip Top of North America, Inc. (RTTNA) and certain of its operating companies in or about June 2020

5

regarding PPP loans the companies had obtained. (Floersch Cert., ¶3). Plaintiff then used that information to start another professional business, forming a wholly-owned limited liability company, SCISSORS LLC, in Delaware on September 11, 2023. (Quinn Cert., Exh. 3). SCISSORS LLC then filed a second *qui tam* False Claims Act lawsuit against the three RTTNA companies that Plaintiff had consulted with in 2020. (Quinn Cert., Exh. 4). This second case was successful, and Plaintiff was paid $2.34 million on the publicly announced settlement of June 25, 2025. (Quinn Cert., Exh. 8).

PKFOD only recently learned of this second lawsuit. RTTNA advised PKFOD on August 15, 2025 that they had decided to move all of their audit and accounting work to a new firm. (Foersch Cert. ¶5). PKFOD only connected RTTNA's decision to replace their auditors with Plaintiff's second FCA in the last several weeks and well after Plaintiff had been terminated by PKFOD.

Before PKFOD knew about any of Plaintiff's actions noted above, Plaintiff and PKFOD entered into a new Partner Services Agreement. ("PSA") on November 10, 2024. (Manisero Cert. ¶8 & Exh. 8). Like the 2018 PSA, they agreed that "the Partner shall devote his or her full working time and efforts to performance of the Partner's duties hereunder and the affairs of the Company Group and shall not engage in any other business, profession or occupation for compensation or otherwise that would conflict or interfere with the rendition of such services, either directly or

6

indirectly, without the prior written consent of the Board." They also agreed that Plaintiff as a partner would perform like other partners "to a standard of competence, skill, integrity and professionalism reasonably consistent" with others similarly situated. (Id. at Exh. 8).

Most important for this motion, they also agreed to arbitrate "any controversy or claim arising out of this Agreement . . . by arbitration before a single arbitrator administered in accordance with the then current Employment Arbitration Rules of the American Arbitration Association [and that] [n]o legal measures shall be taken except to enforce such arbitration and the award of the arbitrator." Id.

Defendants now seek summary judgment under Fed. R. Civ. Pro. 56 that Plaintiff's Complaint be compelled to arbitration as it arises out of the 2024 PSA and/or the 2018 PSA because Plaintiff used his confidentially acquired professional information to form other businesses, CLIP LLC and SCISSORS LLC. He formed these ventures without seeking the consent of PKFOD, and then sued PKFOD clients for his own financial gain, leading to the loss of business and reputational damage to PKFOD and giving rise to PKFOD's right to suspend and terminate him for cause under the 2024 PSA.

These are claims and controversies that "arise" out of the 2024 PSA. The parties agreed to arbitrate such disputes and they should be ordered by this Honorable Court to do so. Further, the parties' arbitration clause evidences the parties' "consent to the

jurisdiction of the Supreme Court of the State of New York for all purposes including the enforcement of the arbitration award." (Manisero Cert., Exh. 8). Since any legal efforts after the arbitration proceeding must be addressed in the Supreme Court of New York, this Honorable Court should dismiss the Complaint and compel arbitration.

## LEGAL ARGUMENT

### POINT I

**THIS MOTION TO COMPEL ARBITRAION MUST BE DECIDED UNDER THE RULE 56 STANDARD AND THERE IS NO DELEGATION PROVISION IN THE PARTIES' ARBITRATION AGREEMNENT; NEVERTHELESS, THE UNDISPUTED MATRIAL FACTS AND SIGNED AGREEMENTS ALLOW THIS COURT TO COMPEL ARBITRATION WITHOUT DISCOVERY**

In determining whether a valid arbitration agreement exists, a court must first decide whether to use the Rule 12(b)(6) or Rule 56 standard of review. See Sanford v. Bracewell & Guiliani, LLP, 618 F. App'x 114, 117 (3d Cir. 2015).

Regarding which standard to use:

The Third Circuit has provided that it is inappropriate to consider a motion to compel arbitration under a Rule 12(b)(6) standard in two instances: (i) if "the complaint and its supporting documents are unclear regarding the agreement to arbitrate," or (ii) "if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue." Guidotti, 716 F.3d at 776. Under either scenario, "the non-movant must be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement." Id. at 774. "After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." Id. (citations omitted).

8

Dorset v. United Healthcare Servs., Inc., 2024 U.S. Dist. LEXIS 118906, *5-*6 (D.N.J. July 8, 2024).

In Young v. Experian Info. Sols., Inc., 119 F.4th 314, 317 (3d Cir. 2024) the Third Circuit clarified earlier precedent on the issue. Young involved Fair Credit Reporting Act violations against Experian. The District Court had denied Experian's motion to compel arbitration under a Rule 56 summary judgment standard and allowed for discovery. On appeal, the Third Circuit reversed because the Experian arbitration clause also had a delegation provision in it. The Third Circuit reasoned:

> In Rent-A-Center, West, Inc. v. Jackson, the Supreme Court held that, due to severability of arbitration provisions from the remainder of a contract, unless a party challenges a "delegation provision specifically, [the court] must treat [the delegation] as valid under § 2, and must enforce it under §§ 3 and 4 [of the FAA], leaving any challenge to the validity of the [a]greement ... for the arbitrator." Rent-A-Center, 561 U.S. 63, 72, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010). And, as more recently articulated in Henry Schein, Inc. v. Archer & White Sales, Inc., "parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." 586 U.S. 63, 69, 139 S. Ct. 524, 202 L. Ed. 2d 480 (2019) (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)). If so, "a court possesses no power to decide the arbitrability issue." Id. at 68.

> Young, 119 F.4th at 321.

Thus, because the plaintiff in Young had not challenged the delegation clause within the arbitration provision, it was up to the arbitrator to determine the legal issues surrounding the fairness of the arbitration provision and whether it was unconscionable.

PKFOD does not contend that 2024 PSA has a distinct delegation provision. Nevertheless, the Third Circuit in <u>Young</u> provided additional guidance to District Courts on the type of discovery, if any, needed to address a motion to compel arbitration under a <u>Rule 56</u> standard:

> some language in <u>Guidotti</u> is more prescriptive than is helpful or accurate. We said that, under the <u>*Rule 56*</u> standard, "'restricted inquiry into factual issues' *will* be necessary to properly evaluate whether there was a meeting of the minds on the agreement to arbitrate," <u>id.</u> (emphasis added) and, accordingly, the non-movant "*should*" get discovery, <u>id.</u> at 776 (emphasis added) and, with greater emphasis, "*must* be given the opportunity to conduct limited discovery on the narrow issue concerning the validity of the arbitration agreement[,]" <u>id. at 774</u> (emphasis added)
> <u>Young</u>, 119 F.4th at 319 (citations omitted).

The Third Circuit in <u>Young</u> clarified these earlier statements in *Guidotti*, pointing out:

> Elsewhere in the opinion, however, we more accurately noted that, "any time the court must make a finding to determine arbitrability, pre-arbitration discovery <u>may</u> be warranted." Then, "[a]fter limited discovery, the court <u>may</u> entertain a renewed motion to compel arbitration ... under a summary judgment standard." <u>*Id. at 776*</u> (emphasis added).
> [<u>Id.</u> (citations omitted)<u>.</u>

The Third Circuit concluded that any necessary <u>Rule 56</u> discovery on a motion to compel arbitration must address "a factual dispute . . . as to the **existence or scope of the arbitration agreement.**" <u>Id.</u> at 320 (emphasis added).

Here there is no factual dispute about the "existence" of the arbitration agreements. Both parties signed the 2024 PSA and both parties are sophisticated. As to the "scope" of the agreement, PKFOD expects Plaintiff to argue that the language of the arbitration clause in the 2024 PSA is not broad enough to encompass his retaliation complaint under the False Claims Act, 31 U.S.C. § 3730(h). Plaintiff, however, does not need discovery about the language of the Agreement to make those legal arguments and neither does PKFOD. The issue of the "scope" of the arbitration clause is not a disputed fact, but a legal question on the proper interpretation of the parties' contract.

In sum, despite the lack of a delegation clause in the arbitration provision, this Court can decide this motion to compel arbitration under <u>Rule 56</u> without automatically allowing a period of discovery as Defendants believe that no discovery on the "scope" of the provision is necessary. Defendants concede though that Plaintiff as the non-moving party is allowed under <u>Rule 56(d)</u> to articulate why he "cannot present facts essential to justify" his position that the arbitration clause does not apply to his Complaint.

<u>POINT II</u>

**THE COURT MUST COMPEL PLAINTIFF TO ARBITRATE HIS COMPLAINT**

**1.     The Federal Arbitration Act Applies to the PKFOD Arbitration Agreement**

11

319229333v.2

As reaffirmed by the United States Supreme Court in AT&T Mobility, LLC v. Concepcion, 563 U.S. 333, 339 (2011), the Federal Arbitration Act ("the FAA") declares a liberal policy favoring the enforcement of arbitration agreements.  The FAA provides: "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  In enacting the FAA, Congress sought to overcome widespread judicial hostility to the enforcement of arbitration agreements.  See Hall St. Assoc., LLC v. Mattel, Inc., 552 U.S. 576, 581 (2008); Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006) (explaining that the FAA was enacted "[t]o overcome judicial resistance to arbitration").  The FAA permits private parties to "trade[] the procedures ... of the courtroom for the simplicity, informality, and expedition of arbitration."  Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991).  The FAA is designed "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible."  Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22 (1983).  To this end, the FAA not only places arbitration agreements on equal footing with other contracts but amounts to a "congressional declaration of a liberal federal policy *favoring* arbitration agreements."  Perry v. Thomas, 482 U.S. 483, 489 (1987) (quoting Moses H. Cone, 460 U.S. at 24) (emphasis added).  "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," and "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration."  Moses H. Cone, 460 U.S. at 24-25 (1983); Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 91 (2000).

12

The PKFOD Arbitration Agreement is indisputably governed by the FAA. Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63-64 (1995) (for state law to apply exclusively to an arbitration agreement, the agreement must opt out of the FAA and express that state law applies).

### 2.     The PKFOD Arbitration Agreement is Valid And By Its Express Terms Encompasses Plaintiff's Complaint

The FAA requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party to the agreement, consistent with the principle that arbitration is a matter of contract.  9 U.S.C. § 4.  In determining whether to compel arbitration under the FAA, only two "gateway" issues need to be evaluated: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute.  PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 407 n.2 (2003); Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83-84 (2002).

As an initial matter, PKFOD notes that there is no language in the False Claims Act and particularly in 31 U.S.C. § 3730(h) that supports the argument that only a court of law can entertain Plaintiff's lawsuit.  Mikes v. Strauss, 889 F.Supp. 746, 755 (S.D.N.Y. 1995) ("Neither §3730(h)'s express language nor its legislative history mention its amenability to arbitration").  Thus, courts reject arguments that the FCA's congressionally recognized public purpose conflicts with private dispute resolution by arbitration.  Id.

The Third Circuit in Khazin v. TD Ameritrade Holding Corp., 773 F.3d 488 (3rd Cir. 2014) addressed an analogous issue. Khazin sued under the 2002 Dodd-Frank Wall Street Reform and Consumer Protection Act.  This Act also amended the earlier Sarbanes-Oxley Act to protect whistleblowers to the SEC from having

13

their lawsuits subject to arbitration.  In Khazin, plaintiff asserted a Dodd-Frank claim and sought to avoid arbitration, relying on the language in the Act that protected SEC whistleblowers from arbitration.  The Third Circuit rejected the argument:

> no provision expressly restricts the arbitration of Dodd-Frank retaliation claims, Khazin contends that a bill as massive as Dodd-Frank will inevitably contain gaps not intended by Congress.  The fact that Congress did not append an anti-arbitration provision to the Dodd-Frank cause of action while contemporaneously adding such provisions elsewhere suggests, however, that the omission was deliberate.
> [Id. at 492].

In short, if Congress want 31 U.S.C. § 3730(h) whistleblower cases not to be arbitrated, they could have easily said so when the made the 2009 and 2010 amendments to 31 U.S.C. § 3730(h).  They did not.

Turning to the language of the arbitration agreement, it applies to "any controversy or claim arising out of this Agreement."  It is anticipated that Plaintiff will argue that this language should be narrowly construed because the language of "arising out of or related to" that is found in other arbitration clauses is allegedly far more encompassing.  Thus, Plaintiff is expected to rely upon out of Circuit case like United States ex rel Paige v. BAE Sys Tech., 566 Fed. Appx. 500 (6th Cir. 2014) and United States ex rel. Dorsa v. Miraca Life Scis., Inc., 33 F.4th 352 (6th Cir. 2022).   In BAE, the Court addressed a FCA retaliation complaint and the defendant seeking to compel arbitration.  The arbitration provision applied to disputes arising under the terms of the agreement, but the Sixth Circuit reasoned that it did not apply to claims "related" to the agreement or that arise from the relationship of the parties. Id. at 504.  Reasoning that the FCA retaliation claim was not for "violation of the

Employment Agreement; it is completely separate from the contract," the Sixth Circuit Court declined to compel arbitration.

The Third Circuit disagrees with this parsing of the words.  In <u>Battaglia v. McKendry</u>, 233 F.3d 720 (3d Cir. 2000), the parties in an earlier lawsuit settled a trust and estate litigation by entering into a settlement agreement and a consulting agreement as part of resolving the dispute.  The settlement agreement had an arbitration clause that applied to "any controversy arises hereunder" and the consulting agreement had no arbitration clause.  A dispute arose between the parties whereby the beneficiary of the trust disputed how funds were being invested and sued in federal court.  The District Court ordered arbitration.

The Third Circuit in <u>Battaglia</u> noted that one of the issues on appeal was whether the arbitration clause was "sufficiently broad to cover disputes related to formation of the Settlement Agreement." <u>Id.</u> at 724.  This issue about the breadth of the arbitration agreement turned on whether "the language 'any controversy that arises hereunder'" should be narrowly read because it failed to use "broader language such as 'any controversy arising under or related to the Settlement Agreement.'" <u>Id</u>.

The Third Circuit in an extensive analysis found that the Court would follow the Eleventh Circuit line of cases that properly construe the words "any controversy that arises hereunder" as broadly applying to all causes of action stemming from the alleged breach of the settlement agreement and rejected the "discredited" line of cases from the Second Circuit, stemming from <u>In re Kinoshita & Co.</u>, 287 F.2d 951 (2d Cir. 1961) about a narrow construction.  <u>Battaglia</u>, 233 F.3d at 725-727.

The Third Circuit in <u>Battaglia</u> concluded:

319229333v.2

> In sum, **when phrases such as "arising under" and "arising out of" appear in arbitration provisions, they are normally given broad construction**, and are generally construed to encompass claims going to the formation of the underlying agreements. See, e.g., St. Paul Fire & Marine Ins. Co., 919 F. Supp. at 135 ("Since 1961 [when Kinoshita was decided], both the Supreme Court and the Second Circuit have taken an increasingly broad view of such phrases as "arising under" and "arising out of " in arbitration agreements, and have concluded that fraudulent inducement claims generally fall within their scope."). This construction of an arbitration provision is consistent with both federal and Pennsylvania precedent holding that an **agreement to arbitrate a particular dispute "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."**

> Id. at 727 (Emphasis added).

Applying the above standard to our facts, the Plaintiff's lawsuit against PKFOD unequivocally is a "controversy arising from" the 2024 PSA. In particular, the PKFOD letter of January 31, 2025, suspending Plaintiff without pay specifically says that this disciplinary action was because of "serious departures by you of professional and ethical standards." (Manisero Cert., Exh. 6). In order to determine the scope of those standards, the arbitrator is going to have to read and understand what Plaintiff contractually agreed to do in the PSA and determine "if he devote[d] his or her full working time and efforts to performance of the Partner's duties hereunder and the affairs of the Company Group" when he formed CLIP LLC and SCISSORS LLC and sued as a Relator to obtain monetary gain. The arbitrator will also have to read the PSA and determine if Plaintiff was engaging "in any other business, profession or occupation for compensation or otherwise that would conflict or interfere with the rendition of … services, either directly or indirectly, without the prior written consent of the Board." The arbitrator will also have to decide if Paragraph 2(d) of the PSA was breached because Plaintiff did not "abid[e] by all policies and procedures of the Company" in suing PKFOD clients without

discussing the lawsuits with management and then failing to advise after December 17, 2024 that he had a second *qui tam* action pending against RTTNA. The arbitrator will also have to decide if Plaintiff performed to the requisite "standard of competence, skill, integrity, and professionalism" required by Paragraph 2(b) of the 2024 PSA.

All of the above issues are a controversy or claim that "arise under the Agreement." Employing the test in Battaglia, Plaintiff cannot possibly contend that this "agreement to arbitrate . . . with positive assurance . . . is not susceptible of an interpretation that covers the asserted dispute." This is the standard that this Honorable Court must employ to determine arbitrability.

Further, it is important to remember that in this FCA retaliation lawsuit, Plaintiff falls within the category of whistleblowers who must prove more than just they did their job, to show their activities are protected from retaliatory behavior from their employer. In United States ex rel. Ascolese v. Shoemaker Constr. Co., 55 F.4th 188 (3d Cir. 2022), the plaintiff was a compliance employee whose job responsibility was to monitor the construction of public housing in North Philadelphia. The general contractor was Shoemaker. The plaintiff worked for MBP as a quality assurance/quality control manager. It was his job to detect and report deficiencies in the design plans and building of the housing complex. The plaintiff contended that he noted a number of deficiencies by Shoemaker and expressed concerns that they needed to correct. He further suggested that the United States Department of HUD should not be paying for certain of the work because it was improper and fraudulent. After these activities, the plaintiff was informed in 2018 that Shoemaker wanted him "off the job" and so MBP terminated him.

17

Plaintiff filed a FCA *qui tam* action on behalf of the government contending that Shoemaker and MBP falsely certified compliance with safety requirements to get paid. He further alleged that his employer had retaliated against him for being a whistleblower. The District Court dismissed the complaint. The Third Circuit then took the opportunity to "address the effect of the 2009–2010 congressional amendments on the FCA retaliation standard." Id. at 194.

While <u>Ascolese</u> did not address an arbitration issue, the Court made the following observation about the heightened burden of proof in a FCA whistleblower retaliation lawsuit because of his job as a compliance officer:

> As a compliance employee, Ascolese must do more than his job responsibilities to trigger FCA protection, like "acting outside [his] normal job responsibilities [or] notifying a party outside the usual chain of command." **This is a fact intensive inquiry.**
> <u>Ascolese</u>, 85 F.4th at 195 (emphasis added).

Here, Plaintiff's role as both the VES 2020 auditor and then *qui tam* Relator against VES, in the context of his job responsibilities as a PKFOD partner will be a "fact intensive inquiry." It will necessarily involve his contractual obligations under the PSA and his professional obligations in adhering to the "policies and procedures" of PKFOD that he is obligated to follow under the PSA. Further, all of these issues "arise" out of the PSA that governed Plaintiff's right and responsibilities as a partner.

In addition, under the PSA, Paragraph 1(b) Plaintiff agreed to perform "to a standard of competence, skill, integrity, and professionalism, reasonably consistent" to his other PKFOD partners who were similarly situated. Thus, even issues of

18

whether Plaintiff adhered to professional standards of professional conduct, are issues that "arise" from the PSA,

Cases outside this Circuit also show that partners in large professional firms must arbitrate their disputes as they invariably "arise" from their partnership agreements. In Pannepucci v. Honigman Miller Schwartz & Cohn, 281 Fed. Appx. 482, 2008 U.S. App, LEXIS 13200 (6th Cir. 2008), a law firm equity partner sued for sex discrimination and pregnancy benefits. The firm sought to arbitrate the dispute as a claim "arising under or related to the Partnership Agreement." The District Court agreed and the Plaintiff appealed contending that the Partnership Agreement had no provision addressing pregnancy benefits and thus her claim was not arising under or related to it. The Sixth Circuit affirmed the decision to arbitrate, reasoning:

> **A proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue."** _Fazio v. Lehman Bros., Inc., 340 F.3d 386, 395 (6th Cir. 2003)_. Panepucci's complaint alleges that she was entitled to more compensation than was distributed. That claim clearly requires reference to, and interpretation of, the Partnership Agreement. …Whatever the arbitrators decide on that question, the answer will surely require interpretation of the Partnership Agreement. … Thus, it appears that Panepucci's complaint falls within the arbitration clause.
>
> [Id. at 486-87 (emphasis added)].

Applying Pannepucci to decide if PKFOD righty suspended and later terminated Plaintiff as a Partner would require a jurist to determine what rights and obligations Plaintiff had under the PSA and PKFOD's "policies and procures" that

are contractually incorporated by reference.  It is also going to require adherence to professional standards required by the PSA.  Once a tribunal has to resort to an interpretation of those agreements to decide the merits of Plaintiff's FCA retaliation lawsuit, the tribunal is deciding a "controversy . . . arising from the Agreement" and the parties agreed to arbitrate those disputes.

Orcutt v. Kettering Radiologists, Inc., 199 F.Supp.2d 746 (S.D. Ohio 2002) is also helpful guidance because in that case, like this one, the whistleblower's employer was not sued in a *qui tam* action.  Instead, the employee claimed her employer took adverse employment action against her because she complained about Medicare fraud being engaged in by a company doing business with the employer.  Chief Judge Rice distinguished a line of cases in the Sixth Circuit refusing to arbitrate and instead followed the holding in Mikes v. Strauss, 889 F. Supp. 746 (S.D.N.Y. 1995):

> The Court finds the holding in Mikes to be more persuasive. At the outset, the Court notes that neither the plain text of the whistleblower statute nor the FCA's legislative history clearly indicate that Congress intended for whistleblower claims to be exempt from arbitration agreements. In addition, Plaintiff herein has not brought a qui tam action against her employer for presenting false claims to the government.
> [Id. at 756]

In sum, Plaintiff in November 2024 signed a PSA with PKFOD where he made contractual promises of how he would conduct himself professionally, how he would be a partner with professionalism and integrity, and how he would adhere to his duty of loyalty and not set up businesses that would provide him financial gain to the detriment of PKFOD and its other partners.  Any disputes that "arise"

20

from this PSA are to be arbitrated and his current FCA whistleblower retaliation lawsuit against PKFOD is one of them.  Pursuant to the 2024 PSA, this case must be dismissed in favor of arbitration.

## **CONCLUSION**

For all the foregoing reasons and authorities cited, Defendants' motion to compel arbitration and dismiss the complaint must be granted.

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
*Attorneys for Defendants, PKFOD Holdings LLC, PKF O'Connor Davies, LLP, and PKF O'Connor Davis Advisory, LLC*

By:     /s/     *Thomas F. Quinn*
Thomas F. Quinn, Esq.
7 Giralda Farms
Madison, NJ 07940
Tel: (973) 624-0800
Fax: (973) 624-0808
thomas.quinn@wilsonelser.com

Dated: September 22, 2025

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL ANDRIOLA, C.P.A. | : **Civil Action No. 3:25-cv-01908-GC-JBD** |
| Plaintiff, | : |
| v. | : |
| PKFOD HOLDINGS, LLC, | : **CERTIFICATION OF THOMAS R.** |
| PKF O'CONNOR DAVIES, LLP, | : **MANISERO, ESQ., GENERAL** |
| and | : **COUNSEL OF PKFOD IN SUPPORT** |
| PKF O'CONNOR DAVIES | : **OF MOTION TO COMPEL** |
| ADVISORY, LLC, | : **ARBITRATION** |
| | : |
| Defendants. | : |
| | : |
| | : |
| | : |

I, Thomas R. Manisero, certify as follows:

1.     I am an attorney at law and I am licensed to practice in New York.  I am also the General Counsel of Defendants, PKFOD Holdings LLC, PKF O'Connor Davies, LLP, and PKF O'Connor Davis Advisory, LLC, (collectively "PKFOD").  I make this certification in support of Defendants' Motion to compel arbitration proceeding.

2.     Annexed hereto as "**Exhibits 1-4** are true and accurate copies of the four agreements that Michael Andriola signed with PKFOD LLP, effective July 9, 2018 as part of becoming a partner: (i) Income Partner Agreement; (ii) Non-Solicitation Agreement; (iii) Confidentiality Agreement and (iv) Income Partner Earnings Agreement.

3.      Annexed hereto as **"Exhibit 5"** is a true and accurate copy of a letter that was emailed to me on December 17, 2024 from defense counsel in <u>Andriola v.</u> <u>Ferriera Construction Co. Inc. et al</u>, Civ. No. 23-cv-03834 (GC-JBD) venued in the United States District Court of New Jersey "(FCA Lawsuit)".  The letter requested the return of allegedly privileged documents that the Ferriera Defendants had allegedly disclosed to Plaintiff in September 2023 when it communicated with him about the lawsuit.

4.      Receipt of this letter was the first time that I or PKFOD management learned of Plaintiff filing this FCA Lawsuit.

5.      After receiving this news, I communicated with Plaintiff and Plaintiff's counsel how Plaintiff's actions were inconsistent with his contractual and ethical duties as a PKFOD partner.

6.      On January 31, 2025, PKFOD suspended Plaintiff as per my letter to him, a true and accurate copy of which is annexed as **Exhibit 6.**

7.      On August 12, 2025, PKFOD notified Plaintiff that he was terminated by PKFOD and a true and accurate copy of my letter to him is annexed as **Exhibit 7.**

8.      On November 10, 2024, Plaintiff entered into a Partner Services Agreement ("2024 PSA") with PKFOD Holdings, LLC.  A true and accurate copy

2

of the 2024 PSA is attached as **Exhibit 8**. It contains a mandatory arbitration provision.

9.     On November 10, 2024, Plaintiff also entered into another agreement with Defendant PKF O'Connor Davies, LLP, entitled the "PKF O'Connor Davies, LLP Third Amended and Restated Limited Liability Partnership Agreement. A true and accurate copy of this Agreement is annexed as **Exhibit 9**. It contains a mandatory arbitration provision.

10.     I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: _____
                Thomas R. Manisero

Dated:      September 22, 2025

3

# EXHIBIT 1

FILED UNDER SEAL

# EXHIBIT 2

FILED UNDER SEAL

# EXHIBIT 3

FILED UNDER SEAL

# EXHIBIT 4

FILED UNDER SEAL

# EXHIBIT 5
FILED UNDER SEAL

# EXHIBIT 6

FILED UNDER SEAL

# EXHIBIT 7

FILED UNDER SEAL

# EXHIBIT 8

FILED UNDER SEAL

# EXHIBIT 9

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL ANDRIOLA, C.P.A. | : Civil Action No. 3:25-cv-01908-GC-JBD |
| Plaintiff, | : CERTIFICATION OF PETER FLOERSCH, |
| | : CPA, IN SUPPORT OF MOTION TO |
| v. | : COMPEL ARBITRATION |
| | : |
| PKFOD HOLDINGS, LLC, | : |
| PKF O'CONNOR DAVIES, LLP, and | : |
| PKF O'CONNOR DAVIES | : |
| ADVISORY, LLC, | : |
| | : |
| Defendants. | : |

I, Peter Floersch, certify as follows:

1.     I am a Partner at PKF O'Connor Davies ("PKFOD"). I submit this Certification in support of Defendants' Motion to Compel Arbitration.

2.     I am the PKFOD Relationship and Engagement Partner for client Rema Tip Top of North America, Inc. ("RTTNA"), a long-time client.

3.     In June 2020, RTTNA's management asked me about obtaining loans from the government under the Payment Protection Program ("PPP"). I cautioned them about making sure the companies qualified for the loans because the PPP regulations that were still evolving disqualified larger companies with over 500 employees from participating, and I was not certain how those rules applied to consolidated and affiliate companies. At the time, my then partner Michael

320783181v.1

Andriola, CPA ("Plaintiff") was considered an internal specialist on PPP matters. I thus asked him to participate in phone calls with RTTNA management on the companies' qualifications and potential size problems. He did have calls with me and RTTNA management on the subject of the PPP loans.

4.       I continued acting as the PKFOD Relationship and Engagement Partner for RTTNA until August 15, 2025, when RTTNA informed me that, effective immediately, RTTNA was moving all of its audit and accounting work to another accounting firm.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

By:  _Peter Floersch_

Peter Floersch, CPA

Dated:       September 22, 2025

2

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| MICHAEL ANDRIOLA, C.P.A. | : | **Civil Action No. 3:25-cv-01908-GC-JBD** |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Civil Action |
| v. | : |  |
|  | : | **[PROPOSED] ORDER GRANTING MOTION** |
| PKFOD HOLDINGS, LLC, | : | **TO COMPEL ARBITRATION AND DISMISS** |
| PKF O'CONNOR DAVIES, LLP, and | : | **THE COMPLAINT** |
| PKF O'CONNOR DAVIES | : |  |
| ADVISORY, LLC, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**THIS MATTER** having been opened to the Court upon application of Wilson, Elser, Moskowitz, Edelman & Dicker LLP, attorneys for Defendants under Fed. R. Civ. Pro. 56 to compel arbitration of the Complaint and the Court having considered the submissions, opposition and reply papers and the Court having found good cause to exist for the entry hereof,

**IT IS** on this _____ day of _____, 2025;

**ORDERED** that Defendants' Motion for Summary Judgment to Compel Arbitration of Plaintiff's Complaint is hereby **GRANTED**; and it is further

**ORDERED** that the Court will dismiss the Complaint without prejudice since under the parties' arbitration clause, any motions to enforce the arbitration award are to be filed in the New York Supreme Court.

**ORDERED,** that a copy of the within Order shall be served upon all counsel of record via ECF/Pacer.

_____
                                    U.S.D.J.

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL ANDRIOLA, C.P.A. : | **Civil Action No. 3:25-cv-01908-GC-JBD** |
| : | |
| Plaintiff, : | **CERTIFICATION OF JEFFREY GITTLER,** |
| : | **CPA, IN SUPPORT OF MOTION TO** |
| v. : | **COMPEL ARBITRATION** |
| : | |
| PKFOD HOLDINGS, LLC, : | |
| PKF O'CONNOR DAVIES, LLP, and : | |
| PKF O'CONNOR DAVIES : | |
| ADVISORY, LLC, : | |
| : | |
| Defendants. : | |

I, Jeffrey Gittler, certify as follows:

1.     I am a Partner at PKF O'Connor Davies ("PKFOD").   I submit this Certification in support of Defendants' Motion to Compel Arbitration.

2.     Annexed hereto as **"Exhibit A"** is a true and accurate copy of my website biography at PKFOD.

3.     I am the PKFOD Partner who performed pre-issuance review with respect to PKFOD's audit of the financial statements of Variable Energy Services ("VES") for the year ended December 31, 2020 (the "VES 2020 Audited Financial Statements"). PKFOD's Audit Report with respect to the VES 2020 Audited Financial Statements was issued on or about March 3, 2021. A true and accurate copy of that Audit Report is annexed as **"Exhibit B."**

320326443v.1

4.    Annexed hereto as "**Exhibit C**" is a true and accurate copy of PKFOD's Report for Processing Checklist ("RPC") for the audit of the VES 2020 Audited Financial Statements. This form is a standard part of the firm's audit workpapers, and shows, among other things, those who involved in the audit and the issuance of PKFOD's Independent Auditor's Report, expressing our opinion about the fair presentation of the financial statements. The Plaintiff Michael Andriola, CPA, a former PKFOD Partner, was the Engagement Partner for this audit and was the Partner with overall responsibility for the audit including the workpapers. I was the "Pre-Issue Reviewer" for quality control purposes, and as shown on Exhibit C, I signed off and approved the draft audit report on March 2, 2021.

5.    I have reviewed Mr. Andriola's Complaint in this matter and particularly Paragraph 9 of the Complaint where he alleges that he spoke with the "independent reviewer for the financial statement," which was me. As I understand his Complaint, Mr. Andriola contends he told me in and around late February or early March 2021 that VES was not eligible to receive the PPP loan. I am certain that we had no such conversation. I have reviewed the workpapers for this audit, and they do not evidence any such a conversation between us, nor do they show any documentation by Mr. Andriola that he had cautioned VES' management that they were ineligible to receive the PPP loan and accept loan forgiveness from the SBA. As part of my quality control review, I would have seen such a note and acted upon

2

it. Under PKFOD's procedures, any such issue would have been escalated to a higher level of PKFOD's management because (a) it would call into question the integrity of VES' management, and (b) it would have had a material effect on the financial statements.

6.    PKFOD's March 3, 2021 Independent Auditors' Report regarding the VES 2020 Audited Financial Statements, **Exhibit B,** is a "clean" audit opinion that states that, in PKFOD's opinion, "the financial statements referred to above present fairly, in all material respects, the financial position" of VES as of, and for the year ending December 31, 2020. In particular, there is nothing in Note 11 of the VES 2020 Audited Financial Statements that even suggests that VES was ineligible to receive a PPP loan. In addition, I would not have signed off as the reviewer unless I thought the financial statements were fairly presented in all material respects.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Respectfully submitted,

By: _Jeffrey Gittler, CPA_
        Jeffrey Gittler, CPA,

Dated:    September 22, 2025

3

# EXHIBIT A

CONTACT US

Home » People » Jeffrey Gittler

# JEFFREY GITTLER

**Partner, PKF O'Connor Davies LLP**
**Partner, PKF O'Connor Davies Advisory LLC**



**Phone: 551-249-1833**
**Email: jgittler@pkfod.com**
**Office: Woodcliff Lake, New Jersey**

*"Our clients and staff -- and, really, the public in general -- expect that the services we provide ensure that the audit of financial statements is thorough, well-constructed and free from undue pressure. I intend to help empower the Firm to meet these g*

Jeffrey Gittler brings more than 35 years of accounting, auditing and tax experience to PKF O'Connor Davies. Jeff is the co-leader of the Firm's **Cannabis** Practice and generally works in the Commercial Practice area.

Prior to joining the Firm, Jeff served as a partner in a regional firm's quality control and accounting and auditing department.  Over the years, he also worked for national and international accounting firms rising from staff accountant to partner serving privately-held and publicly-registered clients.

He was also a technical manager at the American Institute of Certified Public Accountants (AICPA), Durham, NC, where he also chaired the Durham County Audit Committee. At the Institute, he oversaw **peer reviews** throughout the United States and was instrumental in converting the review process to a paperless environment.

Jeffrey has served his community and the profession — and continues to do so — through his active committee and board assignments.

BIO

CV

VCARD

« Previous Person • Next Person »

**Professional Affiliations & Civic Involvement**

- American Institute of Certified Public Accountants (AICPA)
- New York State Society of Certified Public Accountants (NYSSCPA)
  - Vice Chair of the Cannabis Industry Committee
- Pennsylvania Institute of Certified Public Accountants (PICPA)
  - Past Chairman of the Life Path Committee
  - Past Member of the Education Committee and the State Quality Review Committee
  - Past President of the Lehigh Valley Chapter
- Past Member of Board of Directors of Temple Beth El
- Member and Past Treasurer of Local Board of Arthritis Foundation
- Past Treasurer and V.P. of Finance for South Parkland Youth Association

**Accreditations**

- Certified Public Accountant (Pennsylvania, New York)

**Education**

- **Indiana University of Pennsylvania**, Bachelor of Science degree in Accounting and Bachelor of Science degree in Management Information Systems *cum laude*

BIO

CV

VCARD

« Previous Person • Next Person »

# EXHIBIT B

# Valiant Energy Services, LLC

Financial Statements

December 31, 2020



## Independent Auditors' Report

**Members of**
**Valiant Energy Services, LLC**
**Branchburg, New Jersey**

We have audited the accompanying financial statements of Valiant Energy Services, LLC (the "Company"), which comprise the balance sheet as of December 31, 2020, and the related statements of operations, members' capital and cash flows for the year then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Valiant Energy Services, LLC as of December 31, 2020, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*PKF O'Connor Davies, LLP*

March 3, 2021

PKF O'CONNOR DAVIES, LLP
20 Commerce Drive, Suite 301, Cranford, NJ 07016 I Tel: 908.272.6200 I Fax: 908.272.2416 I www.pkfod.com

PKF O'Connor Davies, LLP is a member firm of the PKF International Limited network of legally independent firms and does not accept any responsibility or liability for the actions or inactions on the part of any other individual member firm or firms.

PAGES 2-16 of
EXHIBIT B FILED
UNDER SEAL

# EXHIBIT C

## REPORT PROCESSING CHECKLIST

| Client Name | **Valiant Energy Services** | Project Code | **Yr.** | | **Yr.** | |
|---|---|---|---|---|---|---|
| Client Code | 1842016.000 | | X | Audit | | Comp |
| Eng. Code * | | | | 4010(k)/EBP Review | | AUP |
| | | | | Mgmt Ltr | | OthSEC |
| | | | | TCWG Ltr | | |

| Individual/Department | Procedure | Initials | Date Completed |
|---|---|---|---|
| In-Charge Accountant | Draft report prepared | KT | 2/24/21 |
| Senior Manager/Manager | Draft report reviewed | KT | 2/24/21 |
| Admin/Processing | Initial format/footing | JA | 2/24/21 |
| Engagement Partner | Draft report approved | MA | 2/24/21 |
| Second Partner Review | Engagement Quality Review (EQR) ** | SG | 3/2/21 |
| Pre-Issue Reviewer (QC) | Typed draft report – reviewed | JG | 3/1/21 |
| Pre-Issue Reviewer (QC) | Federal/state single audit report review | | |
| Pre-Issue Reviewer (QC) | Data collection form reviewed | | |
| Admin/Word Processing | Final report formatted | JBA | 3/3/2021 |
| Checking/Final footing | Final report checked | JBA | 3/3/2021 |
| Engagement Partner | Report approved/signature date *** | M | 3/3/2021 |
| Office Services/Engagement Team | F/S PDF created/locked/uploaded to binder | JBA | 3/3/21 |
| Office Services/Engagement Team | Final report issued to client (release date) | JBA | 3/3/21 |
| Office Services/Engagement Team | Date of our report and report release date entered into Engagement | JBA | 3/3/21 |
| Office Services/Engagement Team | RPC saved to Y:\Firm Report Processing drop off | JBA | 3/3/21 |
| Office Services/Engagement Team | RPC scanned into Engagement and binder synced | JBA | 3/3/21 |

\* Applicable only if client code in Engagement is different than CRM.

\*\* Applicable only to: PCAOB public company audit engagements and high risk engagements as defined in the Quality Control Manual and/or an engagement designated by QCA to be subject to EQR.

\*\*\* This line should only be signed when the financial statement has been approved after a technical reviewer and/or EQR has been completed and the report is ready for issuance.

Instructions for use of report processing checklist:

1. As report is processed, individuals responsible for each processing procedure should initial and date each step to signify completion or approval.

2. Refer to PKFOD Report Finalization Policy for firm policies related to releasing a final report.

※ See attached for JBA sign-offs.

**PKFOD**
**September 2020**